1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                 FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   DEMARIA C. HARGE,                    No.  1:20-cv-01255-NONE-SKO (HC)

12                  Petitioner,           **FINDINGS AND RECOMMENDATION
                                          TO DENY PETITION FOR WRIT OF
13         v.                             HABEAS CORPUS**

14   JIM ROBERSON, Warden,                **[THIRTY DAY OBJECTION DEADLINE]**

15                  Respondent.
16

17         Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned

19   pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

20         On July 13, 2020, Petitioner filed the instant habeas petition challenging a Stanislaus

21   County Superior Court conviction for murder, murder of a fetus, vehicular manslaughter while

22   intoxicated, evading a peace officer causing death, and driving under the influence causing injury.

23   The convictions arose out of a traffic collision that resulted in the death of one of Petitioner's

24   passengers and her unborn fetus, and injury to another passenger.  As discussed below, the Court

25   finds the claims to be without merit and recommends the petition be **DENIED.**

26   **I.       PROCEDURAL HISTORY**

27         On May 10, 2017, Petitioner was convicted by jury trial in the Stanislaus County Superior

28   Court of two counts of second degree murder (Cal. Penal Code § 187(a)), one count of gross

                                        1

1   vehicular manslaughter while intoxicated (Cal. Vehicle Code § 191.5(a)), one count of evading a

2   peace officer causing death (Cal. Vehicle Code § 2800.3(b)), and one count of driving under the

3   influence of alcohol causing bodily injury (Cal. Vehicle Code § 23153(a)).  (Doc. 30-2 at 169-

4   172.[1])  On June 7, 2017, Petitioner was sentenced to two consecutive indeterminate terms of 15

5   years to life, plus a concurrent determinate term of 3 years in state prison.  (Doc. 30-2 at 169-

6   172.)

7           Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

8   DCA").  On April 16, 2019, the Fifth DCA affirmed the judgment in a reasoned opinion.  People

9   v. Harge, 2019 WL 1615338 (Cal. Ct. App. 2019).  Petitioner filed a petition for review in the

10  California Supreme Court.  (Doc. 30-13.)  Review was denied on June 19, 2019.  (Doc. 30-13.)

11          Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on

12  September 21, 2020.  (Doc. 30-14.)  The petition was summarily denied on December 23, 2020.

13  (Doc. 30-14.)

14          On July 13, 2020, Petitioner filed the instant petition for writ of habeas corpus. (Doc. 1.)

15  Two of the claims presented were unexhausted at the time of filing, and Petitioner filed a motion

16  for stay and abeyance.  (Doc. 5.)  On September 8, 2020, the Court directed the Clerk of Court to

17  serve the motion for stay on Respondent and granted Respondent an opportunity to respond to the

18  motion.  (Doc. 13.)  On October 8, 2020, Respondent filed an opposition to the motion.  (Doc.

19  15.)  Petitioner did not file a reply.  Upon review of the pleadings, the Court issued Findings and

20  Recommendations to deny the motion for stay and to dismiss the unexhausted claims from the

21  petition.  On December 4, 2020, Petitioner filed objections to the Findings and

22  Recommendations.  (Doc. 19.)

23          While the Findings and Recommendations were pending review by the District Judge, on

24  January 8, 2021, Petitioner lodged an amended petition in which Petitioner represented that he

25  had exhausted his state remedies.  (Doc. 20.)  In light of Petitioner's filing, the Court vacated the

26  Findings and Recommendation and issued a new Findings and Recommendation to deny the

27

28  _____
    [1] Citations are to ECF pagination.

1   motion as moot. (Docs. 21, 23.)  On March 26, 2021, the District Court adopted the Findings and

2   Recommendation and denied the motion as moot.  (Doc. 24.)  The Court then directed

3   Respondent to file an answer to the petition.  (Doc. 25.)  On May 3, 2021, Respondent filed an

4   answer to the petition.  (Doc. 31.)  On November 8, 2021, Petitioner filed a traverse. (Doc. 41.)

## II.     FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

> On April 24, 2014, Harge drove a brown, two-door Lexus northbound on Interstate
> 5 through Stanislaus County at speeds between 100 and 130 miles per hour. Taylor
> L., [Fn.1] who was approximately six and a half months pregnant, was in the front
> passenger seat. Taylor's friend, Cally G., was in the back seat. With a highway patrol
> officer in pursuit, Harge abruptly cut across traffic to take the Howard Road exit. At
> the bottom of the offramp, he sideswiped the rear of a white pickup truck that was
> stopped at a stop sign. The Lexus became airborne and overturned side over side
> multiple times, eventually coming to rest on its roof. The moments immediately
> before and during the collision were captured on video by an officer's dashboard
> camera.
>
> > [Fn.1] To protect the privacy of the victim and percipient witnesses, we refer
> > to them by their first names. For the same reason, we refer to Taylor's family
> > members as "Mother" and "Sister." No disrespect is intended.
>
> Harge and Cally exited the vehicle. Cally had minor injuries. Taylor could not be
> immediately removed from the vehicle and she died of craniocerebral injuries.
> Because of her death, blood circulation to her fetus ceased and the fetus died of
> cerebral hypoxia.
>
> ***The Collision***
>
> Cally and Taylor made plans to take a trip together to Santa Barbara. Cally didn't
> know that Taylor's boyfriend, Harge, would be joining them. However, when Taylor
> came to pick Cally up on April 21, 2014, Harge was driving and stated he didn't
> want Taylor driving by herself due to her pregnancy. They stopped in Santa Barbara
> for a night or two before proceeding to Los Angeles, where they spent another one
> to two nights. [Fn.2] While in Los Angeles, they went out to purchase tea because
> Harge had a stomach ache due to withdrawing from opiates. At one point, Harge
> stated he wanted to go to an emergency room to obtain some Vicodin due to his
> stomach ache.
>
> > [Fn.2] At trial, Cally had difficulty remembering whether they spent two
> > nights in Santa Barbara and one night in Los Angeles, or one night in Santa
> > Barbara and two nights in Los Angeles.
>
> Harge was cordial during the trip until April 24, 2014, the morning of their
> departure. That morning, Harge was in a bad mood and slamming stuff around. He

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts.   Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

said his stomach hurt because he couldn't find any Vicodin. He threw his stuff in the trunk of the car and slammed it shut stating, "Come on." Cally and Taylor got in the car.

After driving for five to ten minutes, Harge stopped at a convenience store. Harge entered the store and came out with a bottle of Patron tequila. He immediately opened it and began drinking. Cally saw Harge drink throughout the drive. He drank approximately ten separate times for a duration of "one thousand, two one thousand, three one thousand" each time. Neither Cally nor Taylor drank any of the tequila.

After driving for another ten to thirty minutes, Harge stopped at a gas station near the beginning of the Grapevine. Harge backhanded Taylor in the face and said, "Bitch, give me some money." Taylor complied. When Harge came back, Taylor got out of the car to apologize. Harge wrapped his hand around Taylor's throat for a couple of seconds and threw her away from him. Taylor started crying and went to go sit down on a bench. Cally followed. Taylor texted her mom and Cally tried to comfort her. Harge drove off.

After about 30 seconds to one minute, Harge turned around and came back. He got out of the car, grabbed Taylor by her hair, and dragged her back into the front passenger seat. Cally got back in the car because she didn't want Taylor to be alone. Harge backhanded Taylor in the face again and Taylor said, "Please, Demaria, I'm pregnant." Harge said, "Bitch, I don't give a fuck about you or that baby. That baby ain't here yet." Harge began driving. He consistently drove at a speed over 100 miles per hour. Cally could clearly see the speedometer. Cally and Taylor asked Harge to slow down at least 20 times. Harge mostly ignored them but a few times told them to "shut the fuck up." At times he reached a speed of 140 miles per hour.

After the gas station, Harge stopped two more times before the crash. One time was at a gas station convenience store. Another time they pulled over because Harge had ash in his eye from smoking a cigarette.

At some point, Taylor texted her mother, "Can you call highway patrol and report a drunk, reckless driver in I-5 northbound coming up on Los Banos?" As a result, Mother called 911 and relayed to them Taylor's vehicle information and location. California Highway Patrol Officer Jonathan Peregoy was dispatched at 2:09 p.m. to respond to a call involving possible domestic violence and a driver possibly driving under the influence. [Fn.3] He had only general information about the vehicle's location. He set up in a cut-out and waited almost forty minutes before he saw a brown Lexus two-door sedan traveling northbound in the number two lane at approximately 100 miles per hour. At the same time, he received a "ping" from Taylor's cell phone, confirming to him that he had seen the correct vehicle. He activated his forward radar unit and obtained a reading of 110 miles per hour.

> [Fn.3] Officer Peregoy was wearing a uniform and was in a marked patrol vehicle.

Officer Peregoy entered the freeway and attempted to overtake the vehicle. He didn't activate his enforcement lights, choosing instead to drive around slower traffic. It took almost three miles for him to get within a reasonable distance of the Lexus. During that time, the Lexus was traveling erratically between the number one and number two lanes at speeds between 100 and 130 miles per hour. An eyewitness was traveling in the number one lane with his cruise control set to 90 miles per hour when the Lexus passed him on the right at a high rate of speed. [Fn.4]

4

[Fn.4] Approximately five minutes later, the eyewitness exited the highway and saw the same Lexus upside down in a ditch on the right-hand side of the onramp.

About a mile south of Howard Road, the Lexus began driving more aggressively and Officer Peregoy activated his enforcement lights. [Fn.5] Meanwhile, inside the Lexus, Cally and Harge noticed a police vehicle behind them with its lights on. Harge said, "Oh, shit, I'm going to jail." Cally and Taylor begged Harge to pull over but he accelerated instead.

[Fn.5] The speed limit in this area of the highway is 70 miles per hour.

As they approached the Howard Road exit, the Lexus was in the number one lane. The Lexus then made a hard turn to exit the freeway, cutting across the number two lane close to another vehicle before cutting across a gore point [Fn.6] and onto the right shoulder of the offramp while maintaining a speed of over 100 miles per hour. The Lexus came back across to the left side of the offramp, then attempted to correct again to the right. At the bottom of the offramp, the Lexus sideswiped a white pickup truck that was stopped at a stop sign. This caused the Lexus to rotate in a clockwise manner as it traversed the intersection before becoming airborne and overturning side over side multiple times. It then traveled up the onramp on the other side, and down the embankment where it came to rest on its roof. The wreck occurred at 2:52 p.m.

[Fn.6] Officer Peregoy described a "gore point" as the dividing section between the freeway and the offramp, a "nondriveable" portion of the paved roadway delineating the offramp from the main travel portion of the freeway.

Officer Peregoy exited his vehicle with his duty weapon drawn. He saw Harge crawling out of the driver's side window and ordered him to get on the ground. Harge refused for approximately thirty seconds but eventually got on his knees. Officer Peregoy placed Harge in handcuffs and had him lay on the ground. Harge smelled of alcohol. He began yelling, "Help her, help her." During this time, Cally also crawled out the driver's side window. At that point, Officer Peregoy believed all passengers were accounted for. However, Cally began to scream, "She's still in there, she's still in there" and "help her" and "She's pregnant." At that point Peregoy saw another individual in the vehicle upside down in the right front passenger seat.

Officer Peregoy entered the vehicle and the first thing he saw was a quarter-full bottle of Patron tequila sitting on the interior driver's side of the roof of the vehicle, blocking his pathway. He attempted to assist Taylor but was unable to free her from the vehicle. She showed no signs of life. After about seven minutes, other officers arrived and attempted, without success, to turn the vehicle over. It took approximately fifteen to twenty minutes for emergency personnel to remove Taylor from the vehicle. After the vehicle was turned over, officers found a quarter-full 375 milliliter Patron bottle on the right rear passenger seat floorboard.

During this time, Harge was yelling and disobedient, and he was eventually transported to a caged vehicle. The transporting officer noticed that Harge had bloodshot and watery eyes and smelled strongly of alcohol. Although he believed Harge was under the influence of alcohol, he did not perform any field sobriety tests due to the need to attend to victims and Harge's lack of cooperation.

Officer Peregoy spoke with Harge while Harge was in a patrol vehicle. Harge smelled of alcohol, was angry and loud, and was acting irrationally or "[a]lmost

5

manic" in that he would be very loud and aggressive with his movements, then go into tears, and then a few seconds later would calm down and speak calmly. Harge was later transported to a hospital and underwent a blood draw at 4:56 p.m. His blood alcohol level was determined to be .067 percent. His blood test also was positive for THC and negative for Norco or Vicodin. A criminalist opined that a male of Harge's approximate weight who had reached peak alcohol absorption two hours earlier would have had an estimated blood alcohol level of .107 percent at that time.

Harge's driving under the influence was determined by investigators to be the cause of the wreck, with unsafe speed being a contributing factor. A mechanical inspection of the Lexus did not reveal any indication a mechanical failure contributed to the wreck.

### Evidence Regarding Alcohol and Substance Use

Taylor's mother was a licensed drug and alcohol counselor. She identified Harge as Taylor's boyfriend. Mother had known Harge for approximately two years and didn't care for him. When she saw him, he was always under the influence. She had seen him under the influence of marijuana, alcohol, Norco and Vicodin. She told him it wasn't good to use pills or drive while on medication. She had inquired whether Taylor stayed in his car when he was street racing.

### Prior Traffic Incidents

The People presented extensive evidence concerning Harge's history of prior traffic incidents.

A witness testified that, on June 20, 2010, she heard a motorcycle accelerate really fast in a residential area and then heard a loud collision. She went to the street and saw a vehicle with extensive damage. The driver of the vehicle had a few bruises. A police officer responded and testified that he saw a motorcycle helmet approximately 100 feet from the collision site, and Harge was on the ground in between the helmet and collision site. Harge was taken by helicopter to a trauma center.

Another officer testified that he pulled Harge over on a San Francisco highway at 3:25 a.m. on February 12, 2012. Harge was traveling 80 miles per hour in a 50 miles per hour zone. Harge performed poorly on three out of four field sobriety tests. He was transported to another location where breath tests administered more than an hour later revealed blood alcohol levels of .061 and .059 percent. Because these levels did not correlate with what the officer observed regarding Harge's level of intoxication, he called in a drug recognition expert. The drug recognition expert testified that he performed the same field sobriety tests as the other officer and concluded Harge showed signs of being under the influence. The parties stipulated that Harge was not prosecuted in relation to this arrest.

A detective from the city of Fairfield testified that, on March 30, 2012, at 10:45 p.m., he observed a vehicle run a red light while making a left turn. At least one vehicle had to brake to avoid a collision. The detective turned on his emergency lights and gave chase. The driver pulled into a parking lot and exited the vehicle, leaving it running while walking away. Harge was booked for reckless driving and driving on a suspended license. Harge eventually failed to appear on that citation on April 7, 2014, approximately two and a half weeks before the collision in this case. A witness testified that she was rear-ended by another vehicle on April 4, 2013 while

6

she was stopped at a red light. She was uninjured but her passenger had minor injuries. The other driver smelled like marijuana and asked her why she had stopped. She explained to him that she had a red light. The responding police officer determined Harge was at fault due to unsafe speed and cited him for failure to provide proof of insurance.

An officer from Suisun City testified that, on April 17, 2013, she observed a black Mustang leave a parking lot with a squealing sound. She pursued the Mustang at speeds of 35 to 40 miles per hour in a 25 miles per hour zone, and 55 to 60 miles per hour in a 35 miles per hour zone. She also observed the vehicle run a red light. She lost sight of the vehicle until another motorist pointed out it had entered a residential area. When she found the vehicle, no one was in it. Harge eventually returned to the car and told the officer his foot slipped on the gas pedal and he panicked. He was cited for speeding and reckless driving. He failed to appear in court in relation to these counts on April 7, 2014.

Harge also was found guilty of speeding based on a June 10, 2013 citation in Alameda County.

Another witness testified that he observed a Mustang spinning donuts in the middle of an intersection on July 26, 2013. The witness was worried about children on the corner who were trying to cross the street and he called police. The responding officer testified that he believed the driver, Harge, was intoxicated. Preliminary alcohol screening tests showed Harge had blood alcohol levels of .083 and .086 percent. Harge was arrested for driving under the influence and his driver's license was confiscated. A subsequent blood draw revealed Harge had a blood alcohol level of .07 percent and also tested positive for benzodiazepnies, opiates, and THC.

Harge's license was suspended in September 2013 based on a suspected DUI in July 2013. His license remained suspended at the time of the wreck.

Taylor's sister testified that Taylor had shown her YouTube videos in October 2013 that showed Harge driving. Harge was present when Sister viewed the videos. Both videos showed Harge in the driver's seat of a vehicle with a toddler in his lap, driving rapidly away and doing doughnuts in the street. The videos were admitted into evidence and played for the jury. Sister told Harge, "That's ridiculous," or "That's stupid." Sister also testified that she heard Harge was suing over a "bad accident" that occurred when he was driving under the influence and fleeing from police officers. However, this latter testimony was stricken.

In jail phone calls made after the wreck, Harge and his brother discussed a YouTube video in which Harge almost hit one of their friends with his car.

Harge, 2019 WL 1615338, at *1–5.

### III.    DISCUSSION

#### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

1  529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

2  guaranteed by the United States Constitution.  The challenged conviction arises out of the

3  Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28

4  U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

5        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

6  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

7  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

8  filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

9  and is therefore governed by its provisions.

10        B.      Legal Standard of Review

11        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

12  the petitioner can show that the state court's adjudication of his claim resulted in a decision: (1)

13  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

14  as determined by the Supreme Court of the United States; or (2) that "was based on an

15  unreasonable determination of the facts in light of the evidence presented in the State court

16  proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams,

17  529 U.S. at 412-413.

18        A state court decision is "contrary to" clearly established federal law "if it applies a rule

19  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

20  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

21  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

22  406).

23        In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

24  an "unreasonable application" of federal law is an objective test that turns on "whether it is

25  possible that fairminded jurists could disagree" that the state court decision meets the standards

26  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

27  application of federal law is different from an incorrect application of federal law.'"  Cullen v.

28  Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

8

1  a federal court "must show that the state court's ruling on the claim being presented in federal

2  court was so lacking in justification that there was an error well understood and comprehended in

3  existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

4       The second prong pertains to state court decisions based on factual findings.  Davis v.

5  Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

6  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

7  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

8  facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

9  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

10 factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

11 among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

12 1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

13      To determine whether habeas relief is available under § 2254(d), the federal court looks to

14 the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

15 Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

16 2004).  "[A]lthough we independently review the record, we still defer to the state court's

17 ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

18      The prejudicial impact of any constitutional error is assessed by asking whether the error

19 had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

20 Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

21 (holding that the Brecht standard applies whether or not the state court recognized the error and

22 reviewed it for harmlessness).

23      In a case where the state court decided the petitioner's claims on the merits but provided

24 no reasoning for its decision, the federal habeas court conducts "an independent review of the

25 record . . . to determine whether the state court [was objectively unreasonable] in its application

26 of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002).  "[A]lthough

27 we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle

28 v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

9

C.      Review of Petition

Petitioner presents four grounds for relief.  He claims: 1) he was denied his constitutional right to a fair trial by the prosecution's presentation of evidence of other bad acts; 2) his due process rights were violated by the trial court's admission of text messages between the decedent and her mother; 3) the prosecutor committed misconduct by presenting false evidence in violation of his due process rights; and 4) defense counsel rendered ineffective assistance by failing to investigate his learning disability and present it as a defense to the charge of second degree murder.

1.      Admission of Other Bad Acts Evidence

In his first claim, Petitioner alleges he was denied his constitutional right to a fair trial when the prosecutor elicited testimony from 13 witnesses of other bad acts done by Petitioner. He complains that many of the instances testified to did not result in convictions, but were highly prejudicial because they encouraged the jury to find Petitioner guilty because he had escaped punishment for the past misconduct.  Petitioner raised this claim on direct review.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Harge challenges the admission of evidence of prior misconduct on the ground the evidence was irrelevant and overly prejudicial. He specifically challenges evidence of other instances of dangerous driving, his alleged violence against Taylor, and his prior use of opioids. The People contend this claim is forfeited and argue alternatively the evidence was relevant and not overly prejudicial. We conclude Harge's argument lacks merit and therefore do not address the People's forfeiture concern.

> **A. Applicable Legal Standards**

> Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210. [Fn.7]) A trial court's determination regarding relevance is reviewed for abuse of discretion. (*People v. Panah* (2005) 35 Cal.4th 395, 474.) Under this standard, the exclusion of evidence will be upheld unless the trial court acted arbitrarily, capriciously, or in a patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Lucas* (2014) 60 Cal.4th 153, 240, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

> [Fn.7] Undesignated statutory references are to the Evidence Code.

> Evidence of prior misconduct is inadmissible to prove conduct on another specified occasion or to prove a person's disposition to commit such an act. (§ 1101, subds. (a), (b).) However, this rule does not preclude admission of evidence of prior misconduct to prove "motive, opportunity, intent, preparation, plan, knowledge,

identity, [or] absence of mistake or accident ...." (§ 1101, subd. (b).) Because of the risk of prejudice to the defendant, evidence of prior uncharged offenses is admissible only if it is substantially probative. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).) A trial court's ruling under section 1101 is reviewed for abuse of discretion. (*People v. Abilez* (2007) 41 Cal.4th 472, 500.)

Under section 352, evidence is inadmissible if the court determines "its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury." (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1028-1029.) Undue prejudice arises if the evidence "'poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) A trial court's ruling under section 352 is reviewed for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 586.)

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.*" (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).) Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. "The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida, supra*, 37 Cal.4th at p. 439.)

### B. Dangerous Driving Evidence

The People offered extensive evidence of Harge's prior acts of dangerous driving to show his knowledge and state of mind on the date of the wreck. We conclude most of the prior driving evidence was relevant for this purpose. To the extent it was not, it also was not prejudicial.

Harge was charged with both second degree murder and gross vehicular manslaughter while intoxicated. A conviction for second degree murder requires a showing of implied malice. To support a finding of implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger. (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).) The standard for implied malice is subjective and therefore requires that the defendant actually appreciated the risk involved. (*Id.* at pp. 296–297.)

A conviction for gross vehicular manslaughter requires a finding of gross negligence, which involves "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Watson, supra,* 30 Cal.3d at p. 296; *People v. Bennett* (1991) 54 Cal.3d 1032, 1036; Pen. Code, § 191.5, subd. (a).) Although gross negligence is evaluated under an objective standard, a defendant's actual awareness of the risks involved in a given enterprise may be relevant to the jury's determination. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 (*Ochoa*).)

In both second degree murder and gross vehicular manslaughter prosecutions, courts regularly permit prosecutors to adduce evidence of prior instances of reckless or intoxicated driving to show a defendant's knowledge or awareness of the hazards of his conduct. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 112-115 [collecting cases and concluding that previous encounters with the consequences of recklessness on the highway sensitize drivers to the dangerousness of life-threatening conduct].) In some of these cases, the prior acts evidence provided overwhelming evidence of

knowledge. (E.g., *People v. Munoz* (2019) 31 Cal.App.5th 143, 149 [prior conviction for driving under the influence and receipt of written advisement that "it is extremely dangerous to human life to drive while under the influence of alcohol"]; *People v. Autry* (1995) 37 Cal.App.4th 351, 355 [multiple prior convictions, warnings not to drink and drive, and attendance at program where participants were "bombarded" with horror stories about driving while intoxicated]; *Ochoa, supra*, 6 Cal.4th at pp. 1204-1205 [prior convictions for driving under the influence of alcohol and attendance at alcohol awareness classes discussing the dangers of drinking and driving].) In other cases, the inference of knowledge is more subtle. (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 532 (*McCarnes*) [prior convictions admissible to show knowledge because "the reason that driving under the influence is unlawful is *because* it is dangerous"]; *People v. Eagles* (1982) 133 Cal.App.3d 330, 340 (*Eagles*) [evidence of excessive speed resulting in a near collision admissible to show awareness of risk of harm].)

Here, there was no evidence Harge attended any educational programs relating to the hazards of drunk driving and only one of the prior instances of misconduct apparently resulted in a conviction. Nonetheless, case law clearly supports admission of the type of evidence presented here to prove knowledge and state of mind. Evidence suggesting that Harge was speeding and involved as a motorcyclist in an accident involving serious injury to himself and also involved in another collision attributed to unsafe speed was relevant to show he was aware that speeding is dangerous. Evidence that Harge was aware of a video in which he almost hit a friend with his car also shows his knowledge of the dangerousness of his driving. Evidence that he had been cited, booked, arrested, or charged for reckless driving, speeding, and driving under the influence likewise was relevant to show his knowledge of the dangers of these activities. Even without a conviction, these instances put Harge on notice that such conduct was unlawful, and therefore dangerous. (See *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1848-1849, disapproved on another ground in *People v. Sanchez* (2001) 24 Cal.4th 983, 991; *McCarnes, supra*, 179 Cal.App.3d at p. 532; *Eagles, supra*, 133 Cal.App.3d at p. 340.) Similarly, evidence that Harge was aware his license had been suspended in connection with a suspected incident of driving under the influence showed he was on notice that his ability to safely operate a vehicle was in serious doubt. (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358-1359.) Evidence that Taylor's sister disparaged Harge after viewing videos of him driving with a toddler in his lap had a similar effect. Because Harge's knowledge of the dangerousness of his conduct was contested at trial, we cannot say the court abused its discretion in concluding the probative value of this evidence outweighed any potential for prejudice.

Evidence also was admitted that Harge was not prosecuted in relation to one incident where he was suspected to be driving under the influence and failed to appear in relation to two other incidents. The People present no articulable basis for admitting this evidence. At the same time, defense counsel made no objection. To the contrary, in one instance, the defense stipulated to the lack of prosecution. We conclude in any event that this evidence was harmless. While the lack of consequences for prior bad acts creates a risk the jury will punish the accused through a verdict on the charged offense, (*Ewoldt, supra*, 7 Cal.4th at p. 405), evidence of the acts themselves was admissible for the reasons stated above.

Furthermore, none of the prior driving evidence was as inflammatory as the facts concerning the instant offense. Cally testified at length regarding the events leading up to the crash, stating that she and Taylor asked Harge to slow down multiple times and begged Harge to pull over once they noticed an officer behind them. Instead, Harge accelerated. Several witnesses testified the vehicle was traveling at an

12

excessive speed. Video evidence showed Harge cut dramatically in front of another vehicle and across the offramp before careening into another vehicle. Cally testified that Harge was drinking while driving and his blood alcohol level two hours after the crash was .067 percent. Harge's deliberate combination of alcohol and excessive speed was itself enough to support a conclusion he acted with conscious disregard for the safety of others. (*Watson, supra,* 30 Cal.3d at pp. 300-301.) His words and deeds reflected complete and conscious disregard for the safety of his passengers. Although knowledge was a disputed issue at trial, we conclude the prior driving evidence, and particularly the evidence that Harge was not prosecuted or failed to appear, was not unduly prejudicial in the context presented here.

### C. Domestic Violence Evidence

Harge contends evidence of his actions against Taylor during the drive – backhanding her, wrapping his hands around her neck, throwing her, dragging her to the car by her hair, and telling her "I don't give a fuck about you or that baby" – "had absolutely nothing to do with this case."

As stated above, a finding of implied malice requires a showing that the defendant consciously disregarded a danger to life resulting from his or her deliberate actions. (*Watson, supra,* 30 Cal.3d at p. 300.) Harge correctly points out that a person who has knowledge of the risks of his conduct but nonetheless engages in that conduct can be said to have consciously disregarded those risks, whether or not he bore any ill will toward his victims. At the same time, however, this rule does not render irrelevant any evidence of anger or ill will. Evidence that Harge lacked regard for Taylor and the fetus was relevant to explain why he may have been willing to disregard risks to them arising from his conduct. Furthermore, this evidence was relevant to the jury's consideration of gross negligence as it explains why Harge may have been consciously indifferent to the consequences of his driving. We therefore reject Harge's claim this evidence was irrelevant, or that its relevance was outweighed by any prejudicial effect.

### D. Evidence of Vicodin Addiction

The People presented evidence that Mother had seen Harge under the influence of Norco or Vicodin on several occasions. Cally testified that, during the trip, Harge was without Vicodin, complained on several occasions that his stomach hurt as a result, and wished to obtain Vicodin. She also suggested Harge demanded money from Taylor during a violent encounter on the drive home because of his desire for Vicodin. Ultimately, a blood draw after the wreck revealed no Vicodin in Harge's system.

The People contend Harge's prior Vicodin use, coupled with his seeming Vicodin withdrawals, provided a motive for his conduct on the date of the incident. Evidence of prior misconduct is admissible to show motive. However, due to the prejudicial nature of evidence of narcotics addiction, our Supreme Court has limited the admissibility of addiction evidence to prove motive. (*People v. Cardenas* (1982) 31 Cal.3d 897, 906-907.) "[T]he cases which have upheld admission of evidence of an accused's drug addiction involved crimes where obtaining narcotics was the direct object of the crime or where a violation of Health and Safety Code was charged," (*People v. Holt* (1984) 37 Cal.3d 436, 450), or where the evidence was "more than 'remotely' relevant to the issues of preparation, plan, knowledge, absence of mistake or accident, premeditation, deliberation, [or] malice ...." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1209, superseded by statute on another point as noted in *In re Steele* (2004) 32 Cal.4th 682, 691.) Where there is "direct probative evidence establishing

13

1  motive," such as the accused's own statement showing a direct connection between
2  his conduct and his drug use, such evidence is generally admissible. (*People v. Felix*
   (1994) 23 Cal.App.4th 1385, 1392-1394.) The evidence that Harge was upset and in
3  pain due to being unable to take Vicodin on the date of the wreck was highly
   probative of his motive. We cannot say the court abused its discretion in permitting
4  relatively minimal testimony regarding Harge's drug use and desire to seek drugs
   for purposes of establishing motive.

5  Furthermore, in the context presented here, the evidence was harmless. As stated,
6  the other evidence against Harge was overwhelming. Furthermore, there was some
   evidence to suggest Harge's use of narcotics was related to a legitimate medical need
   arising from his prior motorcycle accident. We conclude it is not reasonably likely
7  this evidence had the "catastrophic" effect on the jury that Harge contends.

8                    **E. Constitutional Concerns**

9  Based on the foregoing, there was no erroneous admission of evidence which might
   present a due process issue. (See *Partida, supra*, 37 Cal.4th at pp. 436-438.) None
10 of the contested evidence was so prejudicial as to render appellant's trial
   fundamentally unfair.

11

12 Harge, 2019 WL 1615338, at *5–8.

13                    a.      Legal Standard and Analysis

14        This claim is not cognizable on federal habeas review because the admissibility of

15 evidence is a matter of state law.  Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot

16 provide ground for federal habeas relief unless the admission of evidence violated due process).

17 Petitioner also cannot show that the trial court's admission of other bad acts evidence was

18 contrary to or an unreasonable application of Supreme Court precedent pursuant to 28 U.S.C. §

19 2254(d), since there is no Supreme Court precedent governing a court's discretionary decision to

20 admit evidence as a violation of due process.  In Holley v. Yarborough, the Ninth Circuit stated:

21        Under AEDPA, even clearly erroneous admissions of evidence that render a trial
          fundamentally unfair may not permit the grant of federal habeas corpus relief if not
22        forbidden by "clearly established Federal law," as laid out by the Supreme Court.
          28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately
23        addressed a claim, this court cannot use its own precedent to find a state court ruling
          unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.
24
          The Supreme Court has made very few rulings regarding the admission of evidence
25        as a violation of due process. Although the Court has been clear that a writ should
          be issued when constitutional errors have rendered the trial fundamentally unfair,
26        see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that
          admission of irrelevant or overtly prejudicial evidence constitutes a due process
27        violation sufficient to warrant issuance of the writ. Absent such "clearly established
          Federal law," we cannot conclude that the state court's ruling was an "unreasonable
28        application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of

                                          14

AEDPA, we are therefore without power to issue the writ . . . .
_Holley v. Yarborough_, 568 F.3d 1091, 1101 (9th Cir. 2009); see 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  _Id._

Even if the Court were to consider the claim, Petitioner would not be entitled to relief. Petitioner's previous acts of dangerous driving were undoubtedly relevant to the elements of knowledge and state of mind.  In addition, Petitioner disputed his knowledge of the dangerousness of his conduct at trial; therefore, the probative value of the evidence clearly outweighed any potential for prejudice.  Likewise, Petitioner's acts of violence against Taylor were relevant to explain his disregard and conscious indifference to the risks to her and her fetus arising from his conduct.  The evidence of Petitioner's drug use was also highly relevant to motive.

The admission of the evidence was also harmless given the overwhelming evidence against Petitioner.  As noted by the state court, Cally testified in great detail about the events leading up to the crash.  She and Taylor repeatedly asked Petitioner to slow down and pull over but Petitioner only accelerated.  She testified that they traveled at an excessive speed in a reckless fashion, and other witnesses also testified that Petitioner was traveling at a very high rate of speed.  There was video evidence of Petitioner making a sharp turn across the path of another vehicle and onto the onramp before impacting into another vehicle.  Cally also testified that Petitioner had been drinking before and during the trip.  The state court reasonably determined that this evidence was more than sufficient to support a conclusion he acted with conscious disregard for the safety of others.

In sum, Petitioner fails to show that the trial court committed error, let alone constitutional error, and he fails to show any prejudice.  The claim should be rejected.

1        2.      Admission of Text Messages

2        In his next claim, Petitioner alleges the trial court erred in admitting text messages

3  between the decedent and her mother.  He claims the text messages constituted inadmissible

4  hearsay in violation of his constitutional right to a fair trial.  On direct review, in the last reasoned

5  decision, the Fifth DCA denied the claim as follows:

6                          **A. Additional Factual Background**

7        Prior to trial, defense counsel brought a motion in limine seeking to preclude the
   prosecutor from asking Mother questions "that require a hearsay answer." During
8        hearing on the motions in limine, the court ruled that text messages between Taylor
   and Mother made during the April 24, 2014 drive fell within a hearsay exception for
9        spontaneous statements made under the trauma or excitement of the event.

10       At trial, Mother testified that People's Exhibit 9 accurately reflected text messages
   exchanged between herself and Taylor on that date. The following testimony was
11       elicited:

12              [PROSECUTOR]: Q. If you can go ahead and tell us the first message listed
                on People's Exhibit 9.
13

14              A. Okay. "Can you call highway patrol and report a drunk, reckless driver in
                I-5 northbound coming up on Los Banos?"

15              Q. Ma'am, if you could explain to us, what did you do when you got that
                message from your daughter?
16

17              A. I called the police. I did what she asked.

                Q. Did you first have to get some details from her?
18

19              A. Uhm –

                Q. Well, let me ask you this: Do you know what type of car she was in when
20              you first got that message?

21              A. I assumed what car she was in, yes, and then later she stated it.

22              Q. And did you relay all that information as far as location and vehicle color,
                model, that type of thing, to the 911 operator?
23

24              A. I did.

                Q. And if you could just explain to us on the very last page, what's the last
25              message you sent to your daughter?

26              A. "Are you okay?"

27       The text messages were not otherwise discussed in testimony, but the entirety of
   People's Exhibit 9 was admitted into evidence. That transcript reads as follows:
28       [Fn.8]

                                    16

[Fn.8] The exhibit contains additional information, such as date and time stamps, phone numbers, electronic device information, and messages to and from another individual which have not been reproduced here. The messages themselves have been reproduced verbatim, including typographical and grammatical errors.

[Taylor:] Can u call hwy patrol and report a drunk reckless driver. In i5 northbound coming up on los banos

[Mother:] Yep

[Taylor:] Im done with this. I cant take it. Now I hav somebody else to worry about

[Mother:] What's the car year and color?

[Taylor:] Brown lexus

[Mother:] I'm talking to them now

[Mother:] They are contacting Them and I hope he doesn't try to out run them and get in a wreck. Tell him you have to pee so he will stop and then call 911

[Taylor:] Dont say anything bout me. I dont want him to know its me

[Taylor:] I want him to think someone on the road called

[Mother:] You know what. I already called and gave them your name and number because you asked me to. I told them you didn't want Damaria to know you called. Besides. I called not you

[Mother:] And you can let him know I called after I spoke with you and he was driving my daughter and grandbaby while under the influence

[Mother:] I don't give a shit

[Mother:] Are you okay

[Taylor:] Ya. Y did u tell [Sister]

[Taylor:] Now shes mad at me cuz I cant answer the phone.. but I hav no service

[Mother:] Because I was looking for someone who cared about you to vent to

[Mother:] She's mad at you because you told her to mind her own business and she is worried

[Mother:] Again now I know why my sister doesn't talk to me

[Taylor:] She said answer the phone or shes gona tell the police he kidnapped me.. I cant answer.... my service is bad. So ya I did tell her to mind her own business

17

1    [Mother:] I did similar stuff but I never spoke bad to her or told her to mind
     her own business

2
     [Taylor:] I didnt speak bad to her

3
     [Mother:] Now they are going to pull over Demario and he will go to jail for
4    drunk driving and they will take your car

5    [Taylor:] I don't care.. its not mine anyways.. its not in my name and hes not
     gona let me hav it so I dont care

6
     [Taylor:] She does too much and is too judgemental.. I dont need her to act
7    like my mother.. thats what u r for.

8    [Mother:] They just called to get your lactation. Where are you

9    [Mother:] Location

10   [Mother:] There looking now

11   [Mother:] I'll call them back with location

12   [Mother:] Well?

13   [Taylor:] Idk. Coming up on los banos

14   [Mother:] Is there a street name

15   [Mother:] Or exit

16   [Taylor:] No jus road

17   [Mother:] How long has it just been road and from where

18   [Mother:] Where was the gas station

19   [Mother:] Do you know how far to anywhere? There has to be signs

20   [Taylor:] Just passed 33

21   [Mother:] Okay. I told them but they said there are two 33s so they will look
     around both

22
     [Mother:] Your sister just called me in tears because she is worried about
23   you and you told her to mind her own business

24   [Mother:] You have to understand that your choices are stressful to your
     family and saying "stay out of your business" is not optional. We can't help
25   but care and we love you Taylor whether you like it or not

26   [Mother:] [Sister] would drive to Alaska to rescue you

27   [Mother:] Text her an apology

28   [Mother:] I just want you to get to a safe place

                                        18

1        [Taylor:] Im 6 miles from westly exit

2        [Taylor:] Im 6 miles from westly exit

3        [Mother:] They just picked up your phone gps

4        [Mother:] Are you still okay

5        [Mother:] Are you okay

6        **B. Applicable Legal Standards**

7        " Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Hearsay evidence is inadmissible except as provided by law. (§ 1200, subd. (b).) An exception is made for spontaneous statements that purport to "narrate, describe, or explain an act, condition, or event perceived by the declarant" and are "made spontaneously while the declarant [is] under the stress of excitement caused by such perception." (§ 1240, subds. (a), (b); *People v. Morrison* (2004) 34 Cal.4th 698, 718 (*Morrison*).) The "crucial element" in determining whether a statement is admissible under this exception is the "mental state of the speaker at the time the statement was uttered." (*People v. Merriman* (2014) 60 Cal.4th 1, 66.) A trial court's decision to admit evidence under section 1240 is reviewed for abuse of discretion. (*Ibid.*; *People v. Jones* (2013) 57 Cal.4th 899, 956; *Morrison, supra*, 34 Cal.4th at p. 718.) The erroneous admission of hearsay evidence under state law is reviewed for prejudice under the standard articulated in *People v. Watson, supra*, 46 Cal.2d 818. (*Crawford v. Washington*, 541 U.S. 36, 68; *People v. Duarte* (2000) 24 Cal.4th 603, 618–619.)

15       **C. Analysis**

16

17       Regardless of any error in admitting evidence of the text messages, their admission was harmless. We note that Mother testified only to Taylor's initial message requesting that Mother call the police to report a drunk driver. This message could have been admitted for a non-hearsay purpose to establish effect on the listener. (§ 1200; *People v. Sanchez* (2016) 63 Cal.4th 665, 674 [statements that are not offered for their truth are not hearsay].) In any event, overwhelming evidence established that Harge was under the influence of alcohol and driving recklessly on northbound Interstate 5. Taylor's text message did not add substantially to this evidence.

21       Harge specifically alleges prejudice from two other messages: one from Taylor stating that Sister was going to tell the police Harge kidnapped her if Taylor didn't respond to Sister's messages, and one from Mother expressing that Taylor's choices were stressful to her family. Harge contends he was prejudiced by Taylor's family's concern for her. However, these messages reflect more on Taylor's relationship with her family than they do on Harge. Moreover, the fact that the family's concerns ultimately proved prescient does not render the messages prejudicial. Taylor died as a result of Harge's conduct, a fact over which there was no dispute. In the context of the trial, we see no reasonable likelihood these messages affected the jury's verdict.

26       The remaining messages pertain to undisputed factual details such as the make, color, and location of the vehicle, or extraneous information regarding family disputes. We see no prejudice to Harge from the introduction of these statements even assuming they constitute inadmissible hearsay.

28

1   <u>Harge</u>, 2019 WL 1615338, at *8-11.

2                       a.       Legal Standard

3           The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

4   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him

5   . . . ." U.S. Const., Amend. VI.  The Confrontation Clause bars "admission of testimonial

6   statements of a witness who did not appear at trial unless he was unavailable to testify, and the

7   defendant . . . had a prior opportunity for cross-examination." <u>Crawford v. Washington</u>, 541 U.S.

8   36, 53–54 (2004); <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006).  The Confrontation Clause

9   applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  <u>Crawford</u>, 541

10  U.S. at 51 (citation omitted); <u>Davis</u>, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a

11  solemn declaration or affirmation made for the purpose of establishing or proving some fact."

12  <u>Crawford</u>, 541 U.S. at 51 (citation and some internal punctuation omitted); <u>Davis</u>, 547 U.S. at

13  824.  Nevertheless, the Confrontation Clause "does not bar the use of testimonial statements for

14  purposes other than establishing the truth of the matter asserted."  <u>Crawford</u>, 541 U.S. at 59 n. 9.

15  Additionally, a Confrontation Clause violation is subject to harmless error analysis.  <u>Delaware v.</u>

16  <u>Van Arsdall</u>, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does

17  not justify habeas relief, unless it had substantial and injurious effect or influence in determining

18  the jury's verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

19                      b.       Analysis

20          Here, the state court applied the correct legal standard under the Sixth Amendment by

21  applying <u>Crawford</u>, 541 U.S. 36.  The court concluded that the statements did not constitute

22  inadmissible hearsay because they could have been introduced for a non-hearsay purpose.

23  Moreover, the state court determined that any error was harmless under the standard articulated in

24  <u>Chapman v. California</u>, 386 U.S. 18 (1967).  The Supreme Court has held that "[w]hen a

25  <u>Chapman</u> decision is reviewed under AEDPA, 'a federal court may not award habeas relief under

26  § 2254 unless the harmlessness determination itself was unreasonable.'" <u>Davis v. Ayala</u>, 576 U.S.

27  257, 269 (2015) (citing <u>Fry v. Pliler</u>, 551 U.S. 112, 119).  "[A] state-court decision is not

28  unreasonable if "'fairminded jurists could disagree' on [its] correctness." <u>Harrington v. Richter</u>,

1   562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  The

2   appellate court concluded that the statements were harmless because there was independent

3   overwhelming evidence that Petitioner was under the influence while driving, and that his actions

4   caused the deaths of the victims.  In addition, statements concerning relations between Taylor and

5   her family could not have prejudiced Petitioner.  None of this evidence could have affected the

6   jury's determination of guilt.  Petitioner fails to show that no fairminded jurist would agree with

7   the appellate court's determination.  The claim should be denied.

8           3.      <u>Prosecutorial Misconduct</u>

9         Petitioner claims the prosecutor knowingly elicited false testimony in violation of his

10   constitutional rights.  The prosecutor called Cierra Padilla as a witness.  The prosecutor asked

11   Cierra about a prior incident in which Petitioner and his mother had been involved in a bad

12   accident.  (Doc. 30-5 at 202.)  Petitioner alleges the prosecutor knew that it was his mother, not

13   Petitioner, who was driving the vehicle during the incident, but the prosecutor knowingly elicited

14   testimony that it was Petitioner who was driving.  He claims the false testimony was used to

15   portray him as a habitual reckless driver—someone who will not accept responsibility.

16         Petitioner did not raise this claim on direct review.  He first presented it in a petition for

17   writ of habeas corpus to the California Supreme Court.  The California Supreme Court rejected

18   the claim without comment.  In such a situation where the state court decided the claim on the

19   merits but provided no reasoning for its decision, the federal habeas court conducts "an

20   independent review of the record . . . to determine whether the state court [was objectively

21   unreasonable] in its application of controlling federal law."  <u>Delgado</u>, 223 F.3d 976, 982.

22           a.      <u>Legal Standard</u>

23         A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

24   the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Donnelly v.</u>

25   <u>DeChristoforo</u>, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial

26   misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

27   fair trial."  <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987) (quoting <u>United States v. Bagley</u>, 473 U.S.

28   667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the

1   entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The

2   Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged

3   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the

4   aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance

5   of an unfair trial to the accused."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  If prosecutorial

6   misconduct is established, and it was constitutional error, the error must be evaluated pursuant to

7   the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Thompson,

8   74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the

9   constitutional error was harmless.").

10          "[A] conviction obtained by the knowing use of perjured testimony is fundamentally

11  unfair, and must be set aside if there is any reasonable likelihood that the false testimony could

12  have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103 (1976); Napue

13  v. Illinois, 360 U.S. 264 (1959).  So must a conviction obtained by the presentation of false

14  evidence.  See United States v. Bagley, 473 U.S. 667, 678-80 nn.8-9 (1985).  In Napue, the

15  Supreme Court held that the knowing use of false testimony to obtain a conviction violates due

16  process regardless of whether the prosecutor solicited the false testimony or merely allowed it to

17  go uncorrected when it appeared.  Id. at 269.  The Court explained that the principle that a State

18  may not knowingly use false testimony to obtain a conviction - even false testimony that goes

19  only to the credibility of the witness - is "implicit in any concept of ordered liberty."  Id.  In order

20  to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or

21  evidence) was actually false, (2) the prosecution knew or should have known that the testimony

22  was actually false, and (3) the false testimony was material."  United States v. Zuno-Arce, 339

23  F.3d 886, 889 (9th Cir. 2003), cert. denied, 540 U.S. 1208 (2004).  Nevertheless, simple

24  inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

25  the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).

26  "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."

27  Id.

28

1              b.      Analysis

2              Notwithstanding his claim to the contrary, Petitioner fails to establish that the testimony

3   was false and that the prosecutor knew it to be false.  Moreover, as pointed out by Respondent,

4   the testimony was in fact stricken by the trial court.  (Doc. 30-5 at 203.)  Jurors are presumed to

5   follow the court's instructions.  Richardson v. Marsh, 481 U.S. 200, 211 (1987).  Petitioner fails

6   to overcome the presumption that the jury disregarded the testimony when directed to do so.

7   Thus, there is no reasonable likelihood that the alleged false testimony could have affected the

8   judgment of the jury for the benefit of the prosecution.  Agurs, 427 U.S. at 103.  For these reasons,

9   the state court's rejection was not objectively unreasonable.  Delgado, 223 F.3d at 982.

10             4.      Ineffective Assistance of Counsel

11             In his final claim for relief, Petitioner alleges defense counsel failed to adequately

12  investigate his mental health issues and present evidence that he suffers from a learning disability

13  which causes him not to be able to comprehend the consequences of driving fast.  Defense

14  counsel had Petitioner examined by Rebecca Dodge, who listed as her credentials: "Licensed

15  Educational Psychologist;" "School Psychologist;" "Professional Educational Therapist;" and

16  "Board Certified Counselor." (Doc. 30-14 at 42.)  Petitioner faults counsel for failing to follow

17  her recommendation that he be given "a complete psycho-educational re-evaluation to determine

18  his current psychological, academic and vocational functioning. He is only twelve credits short

19  from graduating from high school. This is important to his functioning as a contributing member

20  of society." (Doc. 30-14 at 41.)

21             This claim was first presented in a habeas petition to the California Supreme Court.  The

22  California Supreme Court rejected the claim without comment.  Thus, the Court must conduct "an

23  independent review of the record . . . to determine whether the state court [was objectively

24  unreasonable] in its application of controlling federal law."  Delgado, 223 F.3d 976, 982.

25             a.      Legal Standard

26             Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

27  Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

28  counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

1   U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

2   Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

3   that where a defendant has been actually or constructively denied the assistance of counsel

4   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

5   that Strickland does apply where counsel is present but ineffective).

6          To prevail, Petitioner must show two things.  First, he must establish that counsel's

7   deficient performance fell below an objective standard of reasonableness under prevailing

8   professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

9   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

10  errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

11  sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

12  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

13  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

14         With the passage of the AEDPA, habeas relief may only be granted if the state-court

15  decision unreasonably applied this general Strickland standard for ineffective assistance.

16  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

17  federal court believes the state court's determination under the Strickland standard "was incorrect

18  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

19  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

20  is "doubly deferential" because it requires that it be shown not only that the state court

21  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

22  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

23  state court has even more latitude to reasonably determine that a defendant has not satisfied that

24  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

25  application was unreasonable requires considering the rule's specificity.  The more general the

26  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

27                    b.      Analysis

28         Petitioner fails to establish that counsel erred, or that he was prejudiced from counsel's

1   alleged error.  First, as Respondent correctly notes, Dodge did not possess any records for

2   Petitioner beyond the eighth grade.  Her report, therefore, provided little assistance with respect to

3   Petitioner's current achievements. She offered no insight into Petitioner's current level of reading,

4   writing and comprehension; more importantly, she offered no insight into Petitioner's knowledge

5   and comprehension of driving behavior and whether he could learn from his prior mistakes.  To

6   Petitioner's detriment, she opined that "he is in significant denial regarding his alcohol and drug

7   usage. He still does not see the connection between the amount of alcohol he drinks and his

8   DUI's and his aggressive behavior." (Doc. 30-14 at 42.)  A fairminded jurist could determine that

9   a defense attorney could reasonably decide not to introduce Dodge's testimony, given her

10   conclusion.

11          Second, Dodge was asked to determine "whether [Petitioner] showed implied malice or

12   gross negligence in his legal case." (Doc. 30-14 at 34.)  However, California law does not permit

13   the introduction of capacity evidence or "asking his psychiatrist whether the requisite mental state

14   existed." People v. McCowan, 182 Cal.App.3d 1, 14 (1986); Cal. Penal Code § 25.  The state

15   court could reasonably have determined that Dodge's testimony was inadmissible, and therefore,

16   that counsel was not ineffective in failing to secure her testimony.  Further, the state court could

17   reasonably have determined that Petitioner failed to proffer any actual proposed helpful expert

18   testimony.  For the same reasons, Petitioner cannot demonstrate any prejudice resulting from

19   counsel's alleged error.  Petitioner fails to show that the state court rejection was an unreasonable

20   application of Strickland.  The claim should be denied.

21   **IV.    RECOMMENDATION**

22          Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

23   Corpus be DENIED with prejudice on the merits.

24          This Findings and Recommendation is submitted to the United States District Court Judge

25   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

26   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

27   thirty (30) days after being served with a copy of this Findings and Recommendation, any party

28   may file written objections with the Court and serve a copy on all parties.  Such a document

25

should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 17, 2021**                    _/s/ Sheila K. Oberto_
                                                          UNITED STATES MAGISTRATE JUDGE